**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **JOSEPH H. LEWIS, JR.,** | : | |
| *Plaintiff,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **UNIVERSITY OF PENNSYLVANIA,** | : | **No. 16-5874** |
| *Defendant.* | : | |

## <u>M E M O R A N D U M</u>

PRATTER, J.                                                                                          JANUARY 29, 2018

The University of Pennsylvania seeks summary judgment to defeat the claim by the plaintiff, Joseph Lewis, who alleges that his employer, Penn Police,[1] discriminated and retaliated against him because he has Pseudofolliculitis Barbae, a medical condition that is aggravated by shaving.

Mr. Lewis brings six claims: 1) racial discrimination under Title VII of the Civil Rights Act; 2) failure to provide reasonable accommodations under the Americans with Disabilities Act; 3) disability discrimination and retaliation under the ADA; 4) discrimination and retaliation under the Family and Medical Leave Act; 5) hostile work environment and constructive discharge, and; 6) corresponding violations of the Pennsylvania Human Relations Act and the Pennsylvania Fair Practices Ordinance.[2]

---

[1] Penn Police is the police department for the defendant, University of Pennsylvania. Penn Police is located on the University of Pennsylvania's campus and consists of 120 police officers.

[2] The Third Circuit Court of Appeals has interpreted Title VII, the ADA, the PHRA, and the PFPO in a similar fashion. *See e.g. Dici v. Commw. Pa.*, 91 F.3d 542, 552 (3d Cir.1996) (applying the PHRA in the same manner as Title VII); *see also Joseph v. Cont'l Airlines, Inc.*, 126 F.Supp.2d 373, 376 n. 3 (E.D.Pa.2000) (analyzing Title VII and PFPO claims similarly). The parties have not argued that the PHRA and PFPO claims should be analyzed through a different lens in this case. Thus, Mr. Lewis's PHRA and PFPO claims will be subject to the same fate as his ADA and Title VII claims.

For the reasons set out in this memorandum, the Court grants summary judgment as to Mr. Lewis's claims for:

- Title VII disparate impact;
- ADA reasonable accommodations;
- FMLA interference;
- Constructive discharge, and;
- Claims related to the foregoing under the PHRA and PFPO.

The Court denies summary judgment as to Mr. Lewis's claims for:

- Title VII disparate treatment;
- ADA discrimination;
- ADA and FMLA retaliation;
- Hostile work environment, and;
- Claims related to the foregoing under the PHRA and PFPO.

## BACKGROUND[3]

Joseph Lewis, an African American male, began working as an officer for the Penn Police in 2009. Mr. Lewis's direct supervisor was Sergeant Adler.[4] Beginning in 2012, Mr. Lewis was assigned to Special Beat 40, or SB-40, which meant that he worked from 4:00 p.m. to midnight, Monday through Friday, with Saturdays and Sundays off, in contrast to other officers, who worked rotating 10 hour shifts. Apparently, officers considered SB-40 to be a good shift because of the favorable hours and regular schedule.

---

[3] While there appear to be many disputes of fact, verifying those disputes was often made difficult by Mr. Lewis's occasional failure, in his response to Defendant's Statement of Facts, to provide specific page numbers in documents or depositions cited in support of his denials. Occasionally, Mr. Lewis denied Penn Police's allegations without citing to any evidence to the contrary. Penn Police, in turn, failed to directly respond to Mr. Lewis's statement of undisputed facts.

On a motion for Summary Judgment, the Court must view the evidence presented in the light most favorable to the non-moving party, which, in this case, is Mr. Lewis. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor.").

[4] To complete the chain of command, Sgt. Adler reported to Lieutenant VanDerVort, Lt. VanDerVort reported to Captain Fischer, and Capt. Fischer reported to Superintendent Rush. All of these officers are white, and all but Superintendent Rush are men.

The events at issue in this case center on Penn Police's Directive 45, which requires officers to be clean shaven. This policy allows medical waivers under certain circumstances. Under Directive 45, an officer with a beard for medical reasons must present an updated medical certificate every 60 days and keep facial hair trimmed to ¼ inch in length. In August, 2015, Mr. Lewis requested a waiver of the shaving requirements[5] because he has Pseudofolliculitis Barbae ("PFB"), a skin condition that is irritated by shaving and that predominately affects African American men. At that time, he was the only officer with an active waiver request. Two other African American male officers had requested waivers in the past for the same reason. One of them, Officer Everage, stopped requesting a waiver and started shaving because he felt that some supervisors harassed him about it and that it was inconvenient and costly to continually get medical certificates for a chronic condition. The other officer who applied for a waiver, Officer Archer, also testified that he stopped seeking the waiver because it was inconvenient to get a medical certificate every 60 days and because he felt that his co-workers, including supervisors like Superintendent Rush, looked at him differently because he had a beard.

In early January 2016, Lt. VanDerVort began to pressure Mr. Lewis to shave. Mr. Lewis testified that Lt. VanDerVort called him into his office and told him, "Dude, just shave the beard." On January 14, 2016, Lt. VanDerVort sent Mr. Lewis a text message asking him to bring in a doctor's note for his beard and to trim his beard down to comply with Penn Police policy. When Sgt. Adler asked him for the note on January 19, 2016 and Mr. Lewis reported that he did not yet have one, Sgt. Adler ordered Mr. Lewis to "shave or go home." Lt. VanDerVort claims he gave Mr. Lewis a one day grace period; however, Mr. Lewis disputes this.

---

[5] Penn Police claim that they requested another doctor's note in November, 2015 to support the policy waiver, but Mr. Lewis claims that he never received any such request.

Mr. Lewis testified that his supervisors began checking his facial hair daily, that he was subject to uniform inspections that were not done before, and that comments about his need to shave were pervasive. He testified that his supervisors made his medical condition common knowledge, and that after Lt. VanDerVort had lunch with Officer McKellick, a union representative, Officer McKellick approached him and said, "What are you, Taliban now? You don't have that condition, why don't you shave?" Lt. VanDerVort denies speaking to Officer McKellick about Mr. Lewis's condition. Mr. Lewis testified that other officers would make jokes about shaving, smirk, touch their chin, and stare at him and shake their heads, although he could not name those officers and never complained about the harassment to a superior. At around this time, Mr. Lewis's patrol car was taken away from him, forcing him to walk. While Penn Police state that SB-40 was a walking or biking assignment, they admit that officers at least sometimes were assigned cars for that duty.

Mr. Lewis also signed up for 12 overtime assignments starting in January 2016 and was not assigned any of them. Additionally, he lost field training assignments that he had previously been given, which he believed was because Penn Police did not want an officer with a beard training new officers. Penn Police disputes this and points out that Mr. Lewis was given at least one field training assignment while he had a beard. Mr. Lewis was also denied vacation time on one occasion. Penn Police says they denied the request based on the available manpower but Mr. Lewis alleges that the "vacation book" showed there was plenty of coverage.

On January 19, 2016, Mr. Lewis requested an accommodation. Although Mr. Lewis asserts that the accommodation requested was relief from the constant need to renew the waiver, the request itself states that his suggested accommodation was that he "not shave [his] face or neck" and that he receive "a reasonable exemption to uniform requirement and avoid infectious

agents/chemicals." *See* Def.'s Mot. at Ex. CC (Docket No. 15-6). His request was signed by his dermatologist, who affirmed that his skin condition was permanent and who stated that if he was clean shaven, he risked infection if he had contact with the public. Penn Police construed the request as one to avoid contact with the public and denied the accommodation. On January 20, 2016, Mr. Lewis went to Capt. Fischer to complain about his commanders mistreating him in connection with his beard and underlying skin condition. Capt. Fischer accused him of lying.

On February 29, 2016, after a pre-disciplinary hearing 5 days earlier, Mr. Lewis received a written warning for various policy violations. First, Penn Police claim that he failed to get a Delaware driver's license within 60 days of moving to Delaware, which is contrary to state law and Penn Police policy. Mr. Lewis counters that he ultimately did not move to Delaware until well after he submitted that form and was, therefore, in compliance with the policy. Mr. Lewis also points out that Penn Police did not notice the violation for over six months despite claiming to conduct a check on the status of officer's driver's licenses every 60 to 90 days. Penn Police also claim that Mr. Lewis attempted to destroy his supervisor's old drafts of interview notes regarding this issue. Mr. Lewis disagrees with this characterization of events and says his supervisor said nothing as he watched Mr. Lewis throw away drafts of his notes.

Second, Penn Police claim that Mr. Lewis took 20 minutes to respond to an elevator entrapment call on February 8, 2016, despite being half a block away when he received the assignment, that he did not have his log book with him when he arrived, and that he failed to follow his supervisor's instructions and made false entries. Mr. Lewis says it only took him 11 minutes to answer the call and disputes the exact instructions given to him by his supervisor. Mr. Lewis also testified that on the same day as the elevator incident, Sgt. Adler inspected his car and that, around the same time, Sgt. Adler also pulled his property tax records.

Third, Mr. Lewis claims that he was charged with lying about being ordered to "shave or go home." Mr. Lewis was never disciplined for this charge, however, and Penn Police did not bring it up in their Statement of Facts. The topic of Mr. Lewis's beard also came up at the pre-disciplinary hearing, when Superintendent Rush told Mr. Lewis that it was unprofessional for him to have a beard.

Also on February 29, 2016, Mr. Lewis was told he was to be reassigned to a regular shift, rather than the SB-40 shift because he "wasn't performing" and "was no longer invested" in SB-40, although Mr. Lewis interpreted the reassignment as retaliation for his PFB waiver. In addition, he was put on "sick abuse status" because supervisors identified a pattern of sick day use that they interpreted as against policy. Mr. Lewis denies that he was given proper notice prior to being placed on sick abuse status.[6] Mr. Lewis proceeded to take days off on March 4, 2016 and March 7, 2016 without providing a doctor's note. Sgt. Adler and Lt. VanDerVort asked Mr. Lewis for a doctor's note in the following days, and Mr. Lewis did not supply one.

On March 11, 2016, Mr. Lewis submitted FMLA paperwork requesting medical leave from March 14, 2016 through May 2, 2016. He based his leave request on his sleeplessness and anxiety caused by harassment at work. Later that day, Penn Police called Mr. Lewis into a meeting with Superintendent Rush, Capt. Leddy, and Lts. Belisairo and VanDerVort. What occurred at this meeting is disputed, but Mr. Lewis claims that at some point, Superintendent Rush yelled at him, asked if he could work, and stated, "I'm tired of this, take his gun." Mr. Lewis was then "marched" out of the station, in view of everyone in the department. No one told Mr. Lewis that his employment was terminated at that time, but Mr. Lewis interpreted the events

---

[6] Penn Police claim to have given Mr. Lewis notice in 2015. Mr. Lewis claims that he never received any such notice, and according to policy, notice should be given before placing an officer on sick abuse status. The record does not clarify whether Mr. Lewis ever *received* the notice, although a notice was drafted at that time.

as the termination of his employment. Penn Police continued to pay Mr. Lewis while they processed his FMLA request.

On March 17, 2016, Capt. Leddy wrote to the police union to inform them that Mr. Lewis had been placed on provisional FMLA status and that a pre-disciplinary hearing on Mr. Lewis's failure to provide a doctor's note for sick leave would be rescheduled. On March 22, 2016, Mr. Lewis wrote to Capt. Leddy to inform him that he did not intend to return to Penn Police. On or about that same day, Mr. Lewis started working at the U.S. Department of Veteran Affairs.

## LEGAL STANDARD

A court shall grant a motion for summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks,* 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.* (citing *Anderson,* 477 U.S. at 248). Under Rule 56, the Court must view the evidence presented on the motion in the light most favorable to the non-moving party. *See Anderson,* 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.,* 621 F.3d 249, 252 (3d Cir. 2010).

The movant bears the initial responsibility for informing the Court of the basis for the motion for summary judgment and identifying those portions of the record that demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett,* 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of

evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex,* 477 U.S. at 322.

**DISCUSSION**

## I.    Title VII Racial Discrimination (Count I)

Penn Police have interpreted this count as presenting only a disparate impact claim based on Directive 45. Count I is titled "Racial Discrimination," however, and mentions not only disparate impact, but also disparate treatment. *See, e.g.,* Pl.'s Compl., Docket No. 1, at ¶¶ 65-66 (stating that "[i]n addition, or in the alternative, Defendant failed and refused to apply its policies and procedures in a non-discriminatory manner," and listing several "adverse employment actions" suffered by Mr. Lewis as a result of discrimination). Because Penn Police's motion does not formally challenge any theory other than disparate impact, the Court will not take it upon itself to challenge whether Mr. Lewis can sustain a claim for disparate treatment based on race. Thus, at least part of this count will survive.

As to the disparate impact theory of Mr. Lewis's racial discrimination claim, Penn Police argue that Mr. Lewis has not presented any statistical evidence showing that Directive 45 had a disparate impact on African American men and that, therefore, Mr. Lewis's disparate impact claim must be dismissed. "An unlawful employment practice based on disparate impact is

8

established under [Title VII] only if (i) a complaining party demonstrates that a respondent uses a particular employment practice that causes a disparate impact . . . ; and the respondent fails to demonstrate that the challenged practice is job related for the position in question and consistent with business necessity; or (ii) the complaining party makes the demonstration described in paragraph (C) with respect to an alternative employment practice and the respondent refuses to adopt such alternative employment practice." 42 U.S.C.A. § 2000e-2(k)(1)(A). In other words, "[i]n certain cases, facially neutral employment practices that have significant adverse effects on protected *groups* have been held to violate the Act without proof that the employer adopted those practices with a discriminatory intent." *Watson v. Fort Worth Bank & Tr.*, 487 U.S. 977, 986–87 (1988).

Penn Police focus on the fact that Mr. Lewis has not shown an effect on hiring practices or employment opportunities. While the Third Circuit Court of Appeals has not ruled on the issue of whether disparate impact claims can be brought based on employment conditions as opposed to hiring practices or employment opportunities, other courts of appeals have allowed such claims, and the statutory language itself does not limit disparate impact cases to only those involving hiring or promotions. *See, e.g., Garcia v. Spun Steak Co.*, 998 F.2d 1480, 1485 (9th Cir. 1993) ("[W]e see no reason to restrict the application of the disparate impact theory to the denial of employment opportunities under section 703(a)(2) . . . . Regardless whether a company's decisions about whom to hire or to promote are infected with discrimination, policies or practices that impose significantly harsher burdens on a protected group than on the employee population in general may operate as barriers to equality in the workplace and, if unsupported by a business justification, may be considered 'discriminatory.'"); *Lynch v. Freeman*, 817 F.2d 380, 387 (6th Cir. 1987) (holding that working conditions could form the basis of a disparate impact

claim). *See also Bogaski v. Cnty. Of Allegheny, Pa.*, 244 F. Supp. 3d 476, 489 (W.D. Pa. 2017) ("Defendant can point to nothing in the text of the Civil Rights Act, or in its regulations, case law or underlying policy that would permit maintenance of policies that needlessly disadvantage a protected class merely because the burden falls upon working conditions rather than employment opportunities."). Therefore, the Court concludes that disparate impact claims can apply to employment conditions as well as hiring practices.

Penn Police also argue that Mr. Lewis has not presented statistical evidence showing a disparate impact, even though he is required to do so. Mr. Lewis responds that there is no real dispute that PFB disproportionately affects African American men, and, as a result, it follows that having to continuously provide medical certifications is an employment practice that disproportionately burdens African American men (especially as two other officers with the same condition quit seeking a waiver because of the onerous requirement and harassment). Therefore, Mr. Lewis argues that Directive 45 has a disparate impact on African American men. He claims that 100% of the African American men (3, total, including Mr. Lewis) who suffered from PFB and requested a waiver were subject to the burdensome policy. He points out that the two other officers who requested the waivers found the policy and the harassment that came with not shaving to be sufficiently burdensome that it deterred them from continuing to seek a medical waiver.

While Mr. Lewis claims that three African American men were burdened by Directive 45 and that the reason they were burdened by the policy was a skin condition that predominately affects African American men, he has not carried his burden in proving that this policy had a disparate impact based on race.[7] Mr. Lewis provides no information tending to show that there

---

[7] As the Ninth Circuit Court of Appeals noted in *Garcia*:

are not skin conditions affecting white men that would be exacerbated by shaving. *See EEOC v. Greyhound Lines, Inc.*, 635 F.2d 188, 194 (3d Cir. 1980) (holding, in a case in which plaintiff claimed that a no-beard policy had a disparate impact on African Americans because they are more likely to have PFB, that evidence that black men are likely to grow beards because of PFB was insufficient to prove that the no-beard policy had a discriminatory impact).

Moreover, Mr. Lewis has not shown that the burden caused by the *policy* was significant. Both of the other individuals that Mr. Lewis pointed to as being burdened by the policy cited harassment or fear of harassment for having a beard (as opposed to the policy itself) as a reason they stopped seeking a medical waiver. Harassment, however, was not part of the facially neutral policy, so any burden caused by harassment cannot be considered in assessing whether the policy itself led to a significant burden that disproportionately weighed on African American men.

For these reasons, the Court will grant summary judgment for the defense as to Mr. Lewis's disparate impact claim.[8]

---

When the alleged disparate impact is on the conditions, terms, or privileges of employment . . . determining whether the protected group has been adversely affected may depend on subjective factors not easily quantified. The fact that the alleged effects are subjective, however, does not relieve the plaintiff of the burden of proving disparate impact. The plaintiff may not merely assert that the policy has harmed members of the group to which he or she belongs. Instead, the plaintiff must prove the existence of adverse effects of the policy, must prove that the impact of the policy is on terms, conditions, or privileges of employment of the protected class, must prove that the adverse effects are significant, and must prove that the employee population in general is not affected by the policy to the same degree.

998 F.2d at 1486.

[8] However, Mr. Lewis's disparate treatment claim survives because Penn Police did not challenge it.

## II.     ADA Claim in Count II (Reasonable Accommodation)

Penn Police argue that Mr. Lewis's reasonable accommodation claim must fail because Directive 45 itself provides a reasonable accommodation for Mr. Lewis's PFB.  Mr. Lewis presents both a reasonable accommodation and a disability discrimination claim in Count II.  The Court will discuss the discrimination component of that Count in Section III.A *infra*.

"Discrimination under the ADA encompasses not only adverse actions motivated by prejudice and fear of disabilities, but also includes failing to make reasonable accommodations for a plaintiff's disabilities." *Taylor v. Phoenixville Sch. Dist.,* 184 F.3d 296, 306 (3d Cir. 1999). For an employer "to be found liable for discrimination on the basis of failure to accommodate, the plaintiff must prove '(1) he is a disabled person within the meaning of the ADA; (2) he is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) he has suffered an otherwise adverse employment decision as a result of discrimination . . . [which] in this context include[s] refusing to make reasonable accommodations for a plaintiff's disabilities.'" *Hohider v. United Parcel Service, Inc.,* 574 F.3d 169, 186–87 (3d Cir. 2009) (quoting *Williams v. Phila. Housing Auth. Police,* 380 F.3d 751, 761 (3d Cir. 1999)) (internal quotations omitted).

Penn Police argues that Directive 45 provides a reasonable accommodation for Mr. Lewis, in that it allowed him to have a beard if he provided a periodic medical certificate.  Penn Police construed Mr. Lewis's request for an accommodation as a request not to have physical contact with people under arrest.  The Penn Police argues that such a request was patently unreasonable.  Mr. Lewis, however, counters that this is not what he was seeking and explains that his language was merely an explanation of the risks he would face if he had to shave.  He contends that the accommodation he sought was relief from providing a new certificate every 60 days, given that his skin condition was permanent.  Mr. Lewis, however, has pointed to no

evidence that he requested this particular accommodation, nor has he explained how Penn Police would have or should have known that relief from the requirement of providing regular medical certification is what he sought when he expressly asked to be relieved from shaving.[9]

All the evidence shows is that Mr. Lewis asked to be relieved from shaving, and that Penn Police responded that Directive 45 permits the growth of facial hair with proper medical certifications. Mr. Lewis did not clarify his request or make a new request that would have given Penn Police a better understanding of what he was seeking. Therefore, Mr. Lewis has not shown that Penn Police failed to offer him a reasonable accommodation.

For these reasons, the Court grants summary judgment for the defendant on Mr. Lewis's reasonable accommodation claim.

### III.    ADA Claims in Counts II (discrimination) and VI (retaliation)

Penn Police argues that Mr. Lewis has not met the prima facie case for his ADA discrimination (Count II) and retaliation (Count VI) claims because he has not established that he suffered an adverse employment action. Mr. Lewis does not directly respond to these arguments but instead jumps ahead in the analysis to claim that all of the actions Penn Police took against him were pretext for discrimination and retaliation. "Typically, pretext evidence is considered after a *prima facie* case is established and [after] the defendant has produced non-discriminatory or non-retaliatory explanations for that behavior." *Weston v. Pennsylvania*, 251 F.3d 420, 432 (3d Cir. 2001) (overruled in other parts by *Burlington Northern and Santa Fe Ry. Co. v. White*, 548 U.S. 53 (2006)).

---

[9] In his January 2016 medical certificate, Mr. Lewis says his PFB causes an "infection of face and neck due to shaving" and he is "unable to have physical contact with a person under arrest" as a result of the condition. In the section for suggested accommodations, he writes "not shave face or neck" for an "indefinite" duration. He does not indicate anywhere on the form that he is requesting to be exempted from having to complete future medical waivers for his condition. Def.'s Mot. at Ex. BB (Doc. No. 15-6).

The Court will first consider whether Mr. Lewis has met his burden for the prima facie case of each claim and, then, address Mr. Lewis's pretext arguments under the *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973), burden-shifting analysis, which applies to both ADA discrimination and retaliation. *Shaner v. Synthes*, 204 F.3d 494, 500 (3d Cir. 2000). Under *McDonnell Douglas*, after a plaintiff makes a prima facie showing, "the burden shifts to the employer to provide a legitimate non-retaliatory reason for its conduct." *Carvalho-Grevious v. Delaware State Univ.*, 851 F.3d 249, 257 (3d Cir. 2017). If the employer succeeds on this point, then "the burden shifts back to the plaintiff 'to convince the factfinder both that the employer's proffered explanation was false . . . and that retaliation was the real reason for the adverse employment action.'" *Id.* (citing *Moore v. City of Phila.*, 461 F.3d 331, 342 (3d Cir. 2006)). While the burden of *production* shifts under this analysis, the burden of *proof* always stays with the plaintiff. *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994).

### A. *Prima Facie Case for ADA Discrimination (Count II)*

"To establish a prima facie case of discrimination, a plaintiff must show (1) that he is disabled within the meaning of the ADA, (2) that he is otherwise qualified for the job, with or without reasonable accommodations, and (3) that he was subjected to an adverse employment decision as a result of discrimination." *Sulima v. Tobyanna Army Depot*, 602 F.3d 177, 185 (3d Cir. 2010) (citing *Taylor*, 184 F.3d at 306). The only element of the prima facie case the parties disagree over is whether Mr. Lewis suffered an adverse employment action. The Third Circuit Court of Appeals has "described an adverse employment action 'as an action by an employer that is serious and tangible enough to alter an employee's compensation, terms, conditions, or privileges of employment." *Storey v. Burns Int'l Sec. Servs.,* 390 F.3d 760, 764 (3d Cir. 2004) (internal quotations omitted); *see also Jones v. Southeastern Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015).

Penn Police argue that Mr. Lewis never suffered an adverse employment action and, thus, cannot support his claim for discrimination under the ADA. Penn Police state that reassignment from SB-40, a written warning, investigation into Mr. Lewis' driver's license, and various other actions, including placement on paid administrative leave and additional uniform inspections, are not adverse employment actions within the meaning of ADA discrimination claims. While Penn Police is correct that none of these actions on its own would amount to an adverse employment action, the Court finds that a reasonable jury could conclude that Mr. Lewis suffered an adverse employment action as a result of all of these actions together.

Penn Police reassigned Mr. Lewis from SB-40. They claim that this was not an adverse employment action because it was a purely lateral transfer, in that Mr. Lewis did not receive a reduction in pay and benefits or a change in title, his responsibilities remained the same, and the shift change never took place because it was scheduled for after Mr. Lewis resigned. Furthermore, under the Collective Bargaining Agreement, management has the right to assign shifts. Penn Police also told Mr. Lewis they would not fill his SB-40 position but would give him a chance to earn his spot back.

On February 29, 2016, Penn Police issued Mr. Lewis a written warning for various disciplinary charges. They claim this warning was not an adverse employment action because placement on a performance improvement plan or the temporary placement of a written reprimand in an employee's file is not an adverse action. *See Reynolds v. Dept. of the Army*, 439 Fed. App'x. 150, 153-54 (3d Cir. 2011) (placement of employee on performance improvement plan, without evidence of a change in pay, benefits, or status, was not an adverse employment action); *Weston v. Pa.*, 251 F.3d at 431 (overruled in part on other grounds by *Burlington Northern*, 548 U.S. 53) (written reprimands were not adverse employment actions).

The parties do not dispute that Penn Police issued Mr. Lewis a written warning, which was placed in his personnel file for 270 days. They dispute *why* Penn Police issued the written warning. Penn Police claim to have issued the warning because Mr. Lewis failed to obtain a Delaware driver's license in compliance with state law and Penn Police policy and tore up interview records. Mr. Lewis argues this is all pretext for discrimination against him because of his beard and request for a waiver.

Additionally, around February 29, 2016, Penn Police put Mr. Lewis on "sick abuse status", started conducting additional uniform inspections, and asked him to trim his beard (and charged him an hour of sick time to do so). Less than two weeks later, March 11, Penn Police placed Mr. Lewis on paid administrative leave after a contentious meeting with Superintendent Rush. They argue that none of these amount to adverse employment actions because they were merely enforcing their policies as part of the terms and conditions of Mr. Lewis's employment.

Penn Police is correct that none of these actions on its own is an adverse employment action; however, a reasonable jury could conclude that Penn Police took these actions for discriminatory reasons and, when viewed in the aggregate, that they affected the terms and conditions of Mr. Lewis's employment. Penn Police only began disciplining Mr. Lewis after he grew a beard and, subsequently, requested a waiver from shaving. Mr. Lewis found the actions so distressing that he requested a leave of absence from work. Additionally, the actions are all linked to his disability because Superintendent Rush is on the record saying, "Here's the deal. He had facial hair that I observed, which started off this whole disciplinary process, right." *See* Rush Dep. II, Pl.'s Supp. Br. in Opposition at Ex. S, 73:8-24 (Doc. No. 27-1).

Mr. Lewis met the burden for the prima facie case of his ADA discrimination claim.

## B. *Prima Facie Case for ADA Retaliation (Count VI)*

Mr. Lewis also claims that Penn Police began taking retaliatory adverse employment actions against him shortly after he requested an accommodation from shaving in January 2016 and complained of harassment by fellow officers.

To establish the prima facie case for illegal retaliation under the ADA, a plaintiff must show: (1) protected employee activity; (2) adverse action by the employer either after or contemporaneous with the employee's protected activity, and; (3) a causal connection between the employee's protected activity and the employer's adverse action. *Williams,* 380 F.3d at 759.

The definition of an adverse employment action is broader for retaliation claims than it is for discrimination claims. In *Burlington Northern*, 548 U.S. 53, the Supreme Court addressed whether the application of Title VII's antidiscrimination and antiretaliation provisions encompass the same workplace actions.[10] The Court concluded that the sections differed in language as well as in purpose. *Id*. at 62. "The antidiscrimination provision seeks a workplace where individuals are not discriminated against because of their [disability]. The antiretaliation provision seeks to secure the primary objective by preventing an employer from interfering (through retaliation) with an employee's efforts to secure or advance enforcement of the Act's basic guarantees." *Id.*

"The anti-retaliation provision of [the ADA] covers only those employer actions that are 'materially adverse to a reasonable employee or job applicant' and would 'dissuade a reasonable worker from making or supporting a charge of discrimination.'" *Greer v. Mondelez Global, Inc.*, 590 F. App'x. 170, 175 (3d Cir. 2014) (quoting *Burlington Northern*, 548 U.S. at 68). While this

---

[10] The Third Circuit Court of Appeals analyzes "ADA retaliation claims under the same framework" as Title VII retaliation claims. *Krouse v. American Sterilizer Co.*, 126 F.3d 494, 500 (3d Cir. 1997); s*ee also Shellenberger v. Summit Bancorp, Inc.* 318 F.3d 183, 188 (3d Cir. 2003) ("retaliation claims under the ADA are analyzed under the same framework as Title VII").

encompasses a broader range of actions than those within the antidiscrimination context, a plaintiff must still demonstrate the adverse employment action was "material" as opposed to a "trivial harm" to support a retaliation claim. *Burlington Northern*, 548 U.S. at 54. "Petty slights" and "minor annoyances" are not materially adverse. *Id.* at 68.

Mr. Lewis details nine retaliatory employment actions in his complaint: harassment by supervisors and fellow officers, changes in assignment, denial of overtime, denial of vacation time, mischaracterization of his PFB waiver as a request to avoid contact with the public, citations for rules violations, stripping him of his weapon and placing him on paid leave, actual discharge,[11] and constructive discharge.[12] Most of these actions fall into the category of petty slights or minor annoyances and do not qualify as adverse employment actions on their own. However, for the same reasons as in the discrimination claim, the Court finds that a reasonable jury could conclude that Mr. Lewis suffered an adverse employment action when all of the actions are viewed together. Furthermore, Mr. Lewis suffered adverse employment actions, under the broader definition for retaliation claims, when Penn Police reassigned him from SB-40 and placed him on paid leave.

When Penn Police reassigned Mr. Lewis from SB-40, they claim they were simply moving him to a "regular beat and schedule that matched most of the other UPPD officers," which was entirely within their discretion. Def.'s Mot., at 2 (Docket No. 14). However, courts have found that reassignment can be materially adverse and support a retaliation claim even when there is no reduction in pay. *See Burlington Northern*, 548 U.S. at 70-71 (finding a

---

[11] Mr. Lewis has not pointed to anything in the record that would indicate he was actually discharged. He says he believed he was terminated after his meeting with Superintendent Rush in which he was forced to hand over his weapon and "paraded" out of the station. However, no one at Penn Police told him he was fired and Penn Police continued to pay him until he resigned 11 days later on March 22.

[12] As discussed in Part V.B *infra*, Mr. Lewis's constructive discharge claim does not survive summary judgment and is not an adverse employment action.

reasonable jury could determine reassignment from duties as a forklift operator was materially adverse because the forklift position was more prestigious, less arduous, and required more qualifications). "To be sure, reassignment of job duties is not automatically actionable. Whether a particular reassignment is materially adverse depends on the circumstances of the particular case, and should be judged from the perspective of a reasonable person in the plaintiff's position, considering all the circumstances." *Id.* (internal quotations omitted) (citing *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81 (1998)). It is undisputed that SB-40 was considered a preferable assignment because of the regular schedule and fewer shifts required per week.

Mr. Lewis also demonstrated that placement on paid leave was an adverse employment action for his retaliation claim. While placement on paid leave is not on its own an adverse employment action for ADA discrimination claims, the Third Circuit Court of Appeals has expressly declined to rule on whether it is an adverse employment action for retaliation claims. *Jones*, 796 F.3d at 325 ("Although we need not consider and do not decide whether a paid suspension constitutes an adverse action in the retaliation context . . . we hold that such a suspension generally does not constitute an adverse action in the substantive discrimination context.").

Mr. Lewis focuses on how Penn Police placed him on paid leave. On Friday, March 11, 2016, Mr. Lewis requested FMLA leave to begin the following Monday. At a disciplinary meeting that day, Penn Police asked Mr. Lewis to relinquish his badge and gun and "paraded" him in front of his peers. Ultimately, he was placed on paid leave until he resigned 11 days later on March 22. This exchange was undoubtedly embarrassing and might dissuade someone from asserting his rights under the ADA.

Weighing the evidence of these events in the light most favorable to Mr. Lewis, a reasonable person could be dissuaded from seeking protections under the ADA out of fear of having his shift changed or publicly humiliated or held up to ridicule while being escorted from his job and stripped of his weapon. Mr. Lewis therefore meets the prima facie case for a retaliation claim because he has demonstrated that he suffered these adverse employment actions.

### C. Legitimate Non-retaliatory Reasons for Penn Police's Actions

Under the *McDonnell Douglas* burden-shifting framework, after a plaintiff has met the prima facie case, "the burden shifts to the employer to provide a legitimate non-retaliatory reason for its conduct." *Carvalho-Grevious*, 851 F.3d at 257. Mr. Lewis has made a prima facie case for his claims regarding ADA discrimination and retaliation.

Penn Police says they took many of the actions because Mr. Lewis was in violation of Penn Police rules. For example, they cited Mr. Lewis for not having a Delaware driver's license because he was in violation of Delaware state law and Penn Police policy. They claim they subjected Mr. Lewis to additional uniform checks because he looked disheveled. And, Penn Police says they asked Mr. Lewis to shave because he had not submitted his Rule 45 waiver. Additionally, Penn Police reassigned Mr. Lewis from SB-40 because he "wasn't performing" and "was no longer invested" in SB-40. *See* Rush Dep., Def.'s Mot. at Ex. B, 78:6-17 (Doc. No. 15-1). They argue that management has the right to assign officers to shifts under the Collective Bargaining Agreement and point out that the shift change never took effect because Mr. Lewis resigned on March 22, 2016 before the change was supposed to occur on April 1.

As to the placement on paid administrative leave, Penn Police says it placed Mr. Lewis on paid leave on Friday, March 11, 2016 so that Mr. Lewis did not have to work his final shift before his FMLA leave began the following Monday. Superintendent Rush stated that she did

not believe Mr. Lewis wanted to work his last shift and allowed him to go on leave earlier instead of forcing him to work. Ultimately, the paid leave ended up running until Mr. Lewis resigned on March 22, 2016.

Penn Police has provided legitimate and non-discriminatory reasons for its actions and has satisfied its burden at the second stage of the *McDonnell Douglas* burden-shifting framework.

### D. Pretext

If the defendant can demonstrate legitimate non-discriminatory reasons for its actions, a plaintiff then "must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764; *see also Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir. 2002). Mr. Lewis argues that Penn Police's reasons for reassigning him from SB-40 and placing him on paid leave were all pretextual and that Penn Police was in fact retaliating against him for requesting a waiver from the shaving requirement and complaining about harassment from other officers.

To discredit the defendant's proffered reason, the plaintiff cannot simply show that the defendant's decision was wrong or ill-conceived. The plaintiff must show that there is a genuine dispute as to whether *discrimination* motivated the defendant's actions. *Fuentes*, 32 F.3d at 765. In other words, the relevant inquiry is the perception of the decision maker, not the plaintiff's view of his or her own performance. *Billet v. CIGNA Corp.*, 940 F.2d 812, 825 (3d Cir. 1991) (citations omitted); *see also Ezold v. Wolf, Block, Schorr & Solis-Cohen*, 983 F.2d 509 (3d Cir. 1993) (pretext turns on the qualifications and criteria identified by the employer, not the categories the plaintiff considers important). "[A]t the pretext stage it is not a court's role to

'rul[e] on the strength of cause for discharge. The question is not whether the employer made the best, or even a sound, business decision; it is whether the real reason is' [retaliation]." *Willis v. UPMC Children's Hosp. of Pittsburgh*, 808 F.3d 638, 647 (3d Cir. 2015).

One way a plaintiff can demonstrate pretext is by showing that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action. *Fuentes*, 32 F.3d at 764. Mr. Lewis argues that (1) the temporal proximity between his complaints to Captain Fischer about mistreatment and the retaliatory actions and (2) Superintendent Rush's statements about his beard, demonstrate that the real reasons for the actions Penn Police took were related to his disability and request for an accommodation under the ADA.

Mr. Lewis argues that the allegedly discriminatory and retaliatory actions all took place within four months after he requested a waiver from shaving and only two weeks after he complained to Captain Fischer about mistreatment by Sergeant Adler and other officers. Temporal proximity between taking a protected act under the ADA and the adverse employment action indeed can be indicative of discrimination and retaliation. *Larochelle v. Wilmac*, 210 F. Supp. 3d 658, 704 (E.D. Pa. 2016) (citing *Farrell v. Planters Lifesavers Co.*, 206 F.3d 271, 286 (3d Cir. 2000) (finding two days between a plaintiff disclosing work restrictions related to a disability and firing was "an unduly suggestive temporal proximity"). By the same token, "the mere fact that adverse employment action occurs after a complaint will ordinarily be insufficient to satisfy the plaintiff's burden of demonstrating a causal link between the two events." *Robinson v. City of Pittsburgh*, 120 F.3d 1286 (3d Cir. 1997); *see also Krouse v. American Sterilizer Co.*, 126 F.3d 494, 503 (3d Cir. 1997) (finding that an employer placing the plaintiff on

workers' compensation 19 months after the plaintiff filed an EEOC charge was not sufficient to demonstrate a causal link between the two events).

In further support of this argument, Mr. Lewis points to statements from Superintendent Rush that the disciplinary process started because she saw Mr. Lewis with facial hair. *See* Rush Dep. II, Pl.'s Supp. Br. in Opposition at Ex. S, 73:8-24 (Doc. No. 27-1) ("Here's the deal. He had facial hair that I observed, which started off this whole disciplinary process, right."). He argues that these statements in addition to comments she made about his beard in disciplinary meetings and the fact that she asked supervisors to find out why he was not complying with Directive 45 are all proof positive of pretext. Penn Police counter that Mr. Lewis's facial hair was just one of a number of infractions, including other uniform violations and his driver's license, that Penn Police was investigating.

Given Superintendent Rush's statements that Mr. Lewis's beard sparked the subsequent investigations, which led to disciplinary actions against Mr. Lewis, coupled with the fact that all of these events occurred within four months of when Mr. Lewis requested an accommodation from shaving and just two weeks after he complained about harassment to a superior officer, a reasonable jury well could conclude that the actions were discriminatory and retaliatory in nature. In any case, the Court will not now presume to anticipate the outcome. Mr. Lewis's ADA discrimination and retaliation claims, therefore, survive summary judgment.

## IV.    FMLA Claim (Count IV)[13]

Mr. Lewis requested FMLA leave on March 11, 2016 and was placed on provisional status with pay while Penn Police processed his FMLA request. Penn Police claim that Mr.

---

[13] The Court skips to Count IV because there was no Count III in the complaint.

Lewis cannot show he was denied a benefit for the very reason that he continued to collect his salary and benefits and then was resigned before his FMLA leave request was fully processed.

Mr. Lewis clarifies that his claim under the FMLA is not just an FMLA interference claim, as Penn Police assumed. Rather, he also makes a claim for FMLA retaliation. He points to when Superintendent Rush yelled at him, "I'm tired of this. Take his gun." and he was stripped of his gun and marched out of the station in front of his colleagues as a retaliatory act. Penn Police responds that Mr. Lewis has not submitted any evidence of retaliatory intent.

### A. Interference

To make an FMLA interference claim, Mr. Lewis must demonstrate: (1) he was an eligible employee under the FMLA; (2) the defendant was an employer subject to the FMLA's requirements; (3) he was entitled to FMLA leave; (4) he gave notice to the defendant of his intention to take FMLA leave; and (5) he was denied benefits to which he was entitled under the FMLA. *Capps v. Mondelez Global, LLC*, 847 F.3d 144, 155 (3d Cir. 2017) (citing *Ross v. Gilhuly*, 755 F.3d 185, 191-92 (3d Cir. 2014).

Penn Police concede that Mr. Lewis meets the first four elements; however, they argue that they never denied Mr. Lewis benefits he was entitled under the FMLA. The Court agrees. Mr. Lewis was never denied his FMLA leave but, in fact, resigned before his leave was ever processed. He was placed on provisional Family Medical Leave and continued to collect his salary and benefits until his resignation on March 22, 2016. Mr. Lewis was neither actually nor effectively denied his FMLA leave.

Summary judgment is granted as to Mr. Lewis's claim for FMLA interference.

### B. Retaliation

"Because FMLA retaliation claims require proof of the employer's retaliatory intent, courts have assessed these claims through the lens of employment discrimination law."

*Lichtenstein v. Univ. of Pittsburgh Med. Ctr.*, 691 F.3d 294, 302 (3d Cir. 2012). As a result, FMLA retaliation claims based on circumstantial evidence are assessed under the *McDonnell Douglas* burden-shifting framework.[14] *Capps*, 847 F.3d at 151-52; *see also Lichtenstein*, 691 F.3d at 301-02. To establish the prima facie case for retaliation under the FMLA, Mr. Lewis must show that (1) he is protected under the FMLA; (2) he suffered an adverse employment action; and (3) a causal relationship exists between the decision to terminate him and the exercise of his FMLA rights. *Conoshenti*, 364 F.3d at 146. "When the 'temporal proximity' between the protected activity and adverse action is 'unduly suggestive,' this 'is sufficient standing alone to create an inference of causality and defeat summary judgment.'" *Lichtenstein*, 691 F.3d at 307 (*quoting LeBoon v. Lancaster Jewish Cmty. Ctr. Ass'n*, 503 F.3d 217, 232 (3d Cir. 2007)).

Given that FMLA retaliation analysis parallels that of ADA retaliation, the Court concludes here (as with the ADA retaliation claim in Section III.B) that a reasonable jury could determine that the meeting where Mr. Lewis was placed on leave and escorted out of the station was an adverse employment action for the prima facie case. *Lichtenstein*, 691 F.3d at 302. The Court also finds the fact that Mr. Lewis was escorted from the station on the same day he updated his request for FMLA leave as timing that is suggestive enough to defeat summary judgment for the prima facie case.

The rest of Mr. Lewis's FMLA retaliation claim will also parallel that of his ADA retaliation claim. Since Mr. Lewis has met the prima facie case for FMLA retaliation, "the burden shifts to [Penn Police] to provide a legitimate non-retaliatory reason for its conduct."

---

[14] As noted above in Section III, the *McDonnell Douglas* burden-shifting framework requires the plaintiff to first make the prima facie case of retaliation. Then the defendant must articulate legitimate, non-discriminatory reasons for any adverse employment actions. Finally, the plaintiff then must prove that the articulated reasons were merely pretext for retaliation. *Capps*, 847 F.3d at 152 (*citing McDonnell Douglas*, 411 U.S. at 793).

*Carvalho-Grevious*, 851 F.3d at 257.  Penn Police says they put Mr. Lewis on leave because he did not seem eager to work his last shift, and instead allowed him to begin his leave early.

In the final step of the *McDonnell Douglas* framework, Mr. Lewis has the burden to demonstrate pretext by producing evidence from which the factfinder can either "(1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action." *Fuentes*, 32 F.3d at 764.  The Court finds it inescapably suggestive that Penn Police took their allegedly retaliatory action against Mr. Lewis the same day he submitted his request for FMLA leave.  A reasonably jury could conclude that Penn Police placed Mr. Lewis on paid leave as retaliation for his FMLA leave.  Mr. Lewis's FMLA retaliation claim therefore survives summary judgment.

## V.      Hostile Work Environment and Constructive Discharge (Count V)

Penn Police argue that Mr. Lewis has not shown that any harassment he faced was severe or pervasive enough to constitute a hostile work environment, and, without a hostile work environment claim, the constructive discharge claim must also fail.  The Court will discuss each claim in turn.

### A.   *Hostile Work Environment*

The ADA does not stop at employer discrimination, because the statutory language is not limited to economic or tangible discrimination.  "The phrase 'terms, conditions, or privileges of employment' evinces a congressional intent to strike at the entire spectrum of disparate treatment [including] requiring people to work in a discriminatorily hostile or abusive environment." *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting 42 U.S.C. § 2000e–2(a)(1)).  "When the workplace is permeated with discriminatory intimidation, ridicule, and insult that is

sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment, [the ADA] is violated." *Id.* (internal citations omitted)

To meet the elements of a hostile work environment claim under the ADA, Mr. Lewis must show that: (1) he is a qualified individual with a disability under the ADA; (2) he was subject to unwelcome harassment; (3) the harassment was based on his disability or a request for an accommodation; (4) the harassment was sufficiently severe or pervasive to alter the conditions of his employment and to create an abusive working environment, and; (5) that Penn Police knew or should have known of the harassment and failed to take prompt effective remedial action. *Walton v. Mental Health Ass'n of Southeastern Pa.*, 168 F.3d 661, 666 (3d Cir. 1999) (citing *McConathy v. Dr. Pepper/Seven Up Corp.*, 131 F.3d 558, 563 (5th Cir. 1998)).[15]

Penn Police focuses their arguments on whether the harassment Mr. Lewis suffered was severe or pervasive enough to constitute a hostile work environment. A hostile work environment claim requires that "the harassment 'was sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create and abusive working environment.'" *Walton*, 168 F.3d at 667 (quoting *Harris*, 510 U.S. at 21). This inquiry considers all of the circumstances, including "the frequency of the discriminatory conduct; its severity; whether it is physically threatening or humiliating, or a mere offensive utterance; and whether it unreasonably interferes with an employee's work performance." *Harris*, 510 U.S. at 23.

Penn Police posit that only one stray comment by Officer McKellick in which he stated "What are you, Taliban now?" is the entire basis for Mr. Lewis's hostile work environment claim. Mr. Lewis notes that he was also told that he had no medical reason for not shaving, was

---

[15] The Third Circuit Court of Appeals assumes that there is a hostile work environment cause of action under the ADA, given the Supreme Court has held that almost identical language in Title VII creates a cause of action for a hostile work environment. *Walton*, 168 F.3d at 666.

subjected to pressure by supervisors to shave, endured harassment and jokes from other officers, was required to submit to additional uniform inspections, received admonishments to trim his beard no matter how short it was, and points to testimony from Sergeant Adler that likened his beard to a lifestyle choice.

For the most part, Mr. Lewis relies on the Third Circuit Court of Appeals recent decision in *Castleberry v. STI Group*, which includes discussion that the discrimination a plaintiff suffers in a hostile work environment must be either severe *or* pervasive but it need not be both.  863 F.3d 259, 265 (3d Cir. 2017) (ruling on a motion to dismiss).  Thus, a single instance of harassment may create a hostile work environment in some cases, while a hostile work environment claim of less offensive singular conduct will require a showing that the conduct was more pervasive.  *Id.*

It is puzzling why Mr. Lewis puts so much stock in the *Castleberry* decision.  In that case, the plaintiff was tarred with a racial slur while being threatened with termination. *Castleberry*, 863 F.3d at 265.  The Third Circuit Court of Appeals concluded that this one incident was severe enough to meet the standard for a hostile work environment.  *Id.* at 265-66. Mr. Lewis has not pointed to an individual incident in his experience that rises to the same level of severity as the incident in *Castleberry*.  Instead, the Court must consider whether the discrimination Mr. Lewis claims he suffered was pervasive enough to constitute a hostile work environment.  The Court concludes it was.

Looking at Mr. Lewis's overall experience, a reasonable jury could conclude that the conduct was actionably pervasive.  Between January and March of 2016, Mr. Lewis was repeatedly pressured to shave by his superiors, endured derogatory comments about his beard (at least one of which he complained about), was subjected to additional uniform checks, was denied

overtime assignments, was given written warnings, had his driver's license scrutinized, had his patrol car taken away from him, was placed on sick abuse status, had two disciplinary meetings, and was placed on paid leave. Furthermore, Superintendent Rush is on record as saying that all of these disciplinary actions started because of Mr. Lewis's beard.

Any one of these incidents on its own would not be severe enough to make a claim for hostile work environment; however, given the number of incidents and the short time frame in which they occurred, a reasonable jury could conclude the Mr. Lewis suffered pervasive, discriminatory conduct. Mr. Lewis's hostile work environment claim, therefore survives summary judgment.

## B. Constructive Discharge

Mr. Lewis argues that the evidence supports not only that he was subjected to a hostile work environment, but that he was also constructively discharged. In support of his constructive discharge claim, he also points to the disciplinary charges, which he characterizes as pretextual, and Superintendent Rush's outburst and decision to send him home, which he claims to have interpreted as terminating his employment.

The case for constructive discharge is very similar to the case for a hostile work environment. "To establish a constructive discharge, [the Plaintiff] must show that 'the employer knowingly permitted conditions of discrimination in employment so intolerable that a reasonable person subject to them would resign.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (quoting *Aman v. Cort Furniture Rental Corp.*, 85 F.3d 1074, 1084 (3d Cir. 1996)). In pursuing this inquiry, courts have considered factors such as whether the employer: 1) threatened to fire the employee or urged him to retire; 2) demoted him; 3) reduced pay or benefits; 4) involuntarily transferred the employee; 5) changed the job responsibilities assigned to the employee; or, 6) gave negative performance evaluations to the employee.

*Colwell v. Rite Aid Corp.*, 602 F.3d 495, 502-03 (3d Cir. 2010) (citing *Clowes v. Allegheny Valley Hosp.*, 991 F.2d 1159, 1161 (3d Cir. 1993).

While Mr. Lewis meets the standard for a hostile work environment claim, the Court concludes that those same facts do not suffice to allow the claim to go forward on constructive discharge grounds. Mr. Lewis's employment conditions were not so intolerable that a reasonable person subject to them would have been forced to resign. Penn Police did not threaten to fire or demote Mr. Lewis, nor did they threaten to dock his pay. Penn Police was going to reassign Mr. Lewis from SB-40, but, that reassignment had not taken place yet and he was told the job would not be posted so he could resume the post if he dealt with his disciplinary issues. While he was given a negative performance evaluation in the form of the temporary written reprimand, that reprimand was for violations of Penn Police policies that Mr. Lewis admits he violated (including violations of the driver's license policy and not having his log book when he responded to the elevator incident).

Most notably, the interaction with Superintendent Rush in which she told Mr. Lewis to go home was not as clearly a discharge as Mr. Lewis makes it out to be. Mr. Lewis was scheduled to start FMLA leave the following Monday, which was also his next shift, when this incident occurred. As humiliating as it may have been to turn in his gun and leave in full view of his fellow officers, a reasonable person in that position would not have been compelled to resign. The actions Penn Police took were in compliance with its policies for when officers go on long term leave. Mr. Lewis was going on FMLA leave and would not be returning to work until May, at which point he would get his gun back. Even if Mr. Lewis was personally offended by the action, "the law does not permit an employee's subjective perceptions to govern a claim of

constructive discharge." *Gray v. York Newspapers, Inc.*, 957 F.2d 1070, 1083 (3d Cir. 1992)

(quoting *Bristow v. Daily Press, Inc.,* 770 F.2d 1251, 1255 (4th Cir. 1985).

For these reasons, the Court dismisses Mr. Lewis's constructive discharge claim.

## CONCLUSION

For the reasons set out in this memorandum, the Court grants summary judgment as to

Mr. Lewis's claims for:

- Title VII disparate impact;
- ADA reasonable accommodations;
- FMLA interference;
- Constructive discharge, and;
- Claims related to the foregoing under the PHRA and PFPO.

The Court denies summary judgment as to Mr. Lewis's claims for:

- Title VII disparate treatment;
- ADA discrimination;
- ADA and FMLA retaliation;
- Hostile work environment, and;
- Claims related to the foregoing under the PHRA and PFPO.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE

31